Filed 3/28/14  P. .v Shackleford CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G047205 |
| v. | (Super. Ct. No. 09WF2281) |
| ROGER NEAL SHACKLEFORD, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Frank F. Fasel, Judge.  (Retired judge of the Orange Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed in part, reversed in part, and modified.

Michael Norris for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Kristine A. Gutierrez, Lynne G. McGinnis and Alastair Agcaoili, Deputy Attorneys General, for Plaintiff and Respondent.

The main issue at trial in this case was identification. Appellant Roger Shackleford claimed he was wrongly implicated in a daytime burglary that took place in Huntington Beach in 2009. A jury convicted him of that crime, as well as street terrorism. It also found appellant committed the burglary for the benefit of his gang. Appellant contends the trial court erred in admitting evidence of an uncharged burglary, the burglary charge should have been tried separately from the gang charges, and there is insufficient evidence to support the jury's findings. Although we reject these claims, we agree with appellant that his sentence on the gang enhancement must be reduced from 10 to 5 years because the prosecution did not plead the factual requirements to permit the greater punishment. Other than to modify appellant's sentence in that regard, we affirm the judgment.

## FACTS

On August 11, 2009, Shane Truax of Huntington Beach stayed home from work and slept in late because he had a cold. Shortly after noon, he was awakened by noises. He thought it was his roommates coming and going, but when he got up and opened his bedroom door, he saw an intruder holding a nylon stocking. When Truax asked him what he was doing, the man turned and ran out the front door.

Truax promptly gave chase. When he got to his driveway, he paused momentarily, and a second man darted out of his house and ran past him. The second man came within a couple of feet of Truax, giving Truax a pretty good look at the side of his face. The second man followed the first, and Truax ran after both of them. About halfway down the block, a car pulled up in the middle of the street, and the two men got inside. The car took off before Truax had a chance to see the driver, but he was able to get the car's license number.

When Truax got back to his house, he called 911 and discovered his roommates' bedrooms had been ransacked. He also found a pillowcase that contained a laptop computer, watch and other items that belonged to his roommates. When the police

2

arrived, Truax told them the men he had encountered were both black. He described the first one as 19 years old, five-foot eleven with a medium build and short hair, and the second one as 17 years old, five-foot eight, with braided, "cornrow" style hair.

The police traced the license number of the getaway car to Midway Car Rental. Midway's records showed the car had been rented to Erica Jones on August 10, 2009, the day before the Truax burglary. Jones returned the car on August 17, 2009, at which time she rented another vehicle, a white Toyota Camry.

The next day, sheriff's deputies stopped the Camry for a traffic violation in South Central Los Angeles. At that time, appellant was behind the wheel, his brother Rodney was in the front passenger seat, and codefendant Frank Tisby was in the back of the car. Tisby had short hair and a goatee. In response to the deputies' questions, he and Rodney both admitted they belonged to the Rollin' 30's Crips. The police also learned Rodney was Jones' boyfriend.

On September 10, 2009, a month after Truax's home was burglarized, the police showed him three photographic lineups containing six photos each. In the first lineup, Truax identified Tisby as the person he had seen inside his house. In the second lineup, he identified appellant as the person who ran past him in the driveway. And in the third lineup, which contained Rodney's picture, Truax did not identify anyone.

At the preliminary hearing, Truax was unable to identify appellant. And at trial, he initially identified appellant as the person who he had seen inside his house, and Tisby as the one who ran past him in the driveway. However, after speaking to the prosecutor during a break in the proceedings, Truax changed his testimony to conform to his pretrial identifications, saying Tisby was the first man he encountered and appellant was the second. He said he got appellant and Tisby mixed up in the courtroom because their appearances had changed since the burglary, and Tisby was wearing his hair in cornrows during the trial.

3

Police Sergeant Rich Burgoyne, who conducted the photo lineups, testified appellant was in fact a lot slimmer and Tisby was a lot heavier back in 2009 than they were at the time of trial in 2012. He also recollected that, in 2009, Tisby had a short, clean-cut hairstyle, and appellant wore his hair in cornrows.

Sheri Tully testified about an incident that occurred on November 5, 2009, three months after the Truax burglary. At 11:45 that morning, Tully noticed a woman pounding on her neighbor's front door in Torrance. Just as Tully was about to tell the woman that no one was home, she walked to a car that was parked in front of the neighbor's house and drove away.

About five minutes later, the car returned to the same spot. This time, two black males exited the vehicle. Tully watched as they entered her neighbor's front gate and made their way in to the backyard. At that point, she lost sight of the men and called 911. Then she saw the men leaving the backyard at a brisk pace. One of the men had a sock or a glove on, and the other had a teardrop tattoo under his right eye. They entered the car that had dropped them off, and then the car drove away.

When the police arrived, they took Tully to a nearby shopping center to see if she recognized a car that had been abandoned there. The car belonged to Rodney's girlfriend Erica Jones, and Tully identified it as the vehicle she had seen. When shown a photographic lineup, Tully also identified appellant as the man with the teardrop tattoo. At trial, she confirmed appellant was that person.

Gang expert Ryan Marshall of the Los Angeles Police Department testified he works in the area of South Central Los Angeles that is claimed by the Rollin' 30's Crips. He said the gang is primarily made up of African-American males, and it had about 700 members in 2009. As part of his duties, Marshall has investigated and talked to numerous members of the gang, including appellant and Tisby. They have admitted being members of the Rollin' 30's, and appellant has a tattoo signifying his allegiance to the gang.

4

Marshall testified the primary activities of the Rollin' 30's are narcotics sales, shootings, robbery and residential burglary. Most of the residential burglaries are committed outside the gang's territory, in the greater Los Angeles area. They are also usually committed in a particular fashion that has earned the Rollin' 30's the nickname "the knock-knock burglars."

Describing how these burglaries are typically carried out, Marshall said three or four Rollin' 30's members will use a rental car that is registered to a third person, so the vehicle is harder to trace to them. Then they will drive to an area in the middle of the day, when people are likely to be at work. They will knock on the door, and if someone answers, they will make up an excuse for being there and leave. But if no one answers, they will go around to the side or back of the house and enter through a door or window. Then they will grab a pillowcase and start loading up portable valuables, such as jewelry, money and electronics. To avoid detection, the burglars wear gloves, and their driver will sometimes utilize a police scanner to monitor law enforcement activity in the area.

Marshall testified there is a clique of Rollin' 30's members who specialize in these types of burglaries. These members have to be able to trust each other in terms of knowing what to do and knowing they will not tell on each other if they get caught by the police. The burglaries are a way for the clique members to "put in work" for the gang. The burglaries bring in money for the gang, which not only allows its members to buy drugs and guns, but to pay for rental cars to commit additional burglaries. The money also allows Rollin' 30's members to wear nice clothes and have big parties, which are important for recruiting younger members. Based on the circumstances presented in this case, Marshall opined the Truax burglary was committed for the benefit of the Rollin' 30's gang.

Looking at appellant in the courtroom, Marshall said he bears a close resemblance to his brother Rodney. Marshall also testified appellant weighed less and

5

wore his hair in cornrows when the burglary occurred in 2009.  In comparison, Tisby looked thinner at trial than the last time Marshall had seen him before trial.  Marshall said that outside the trial in this case, he had never seen Tisby wear his hair in cornrows.

Appellant's defense was mistaken identification.  In support of that defense, appellant's former girlfriend testified appellant was with her in Studio City on the morning of the Truax burglary.  Appellant's barber testified he had never seen appellant wear his hair in cornrows.  And Jones testified she had never given appellant permission to use her car.  However, in rebuttal, Sergeant Burgoyne testified that when he interviewed Jones in October 2009, she said appellant did have permission to drive her car.

The parties stipulated the Rollin' 30's were a criminal street gang at the time of the Truax burglary.  They also stipulated the rental car used in that burglary was examined and found to contain the fingerprints of Rodney and a woman named Virginia Williams, but not appellant's.

The jury convicted appellant of first degree residential burglary and active participation in a criminal street gang, aka street terrorism.  (Pen. Code, §§ 459, 460, subd. (a), 186.22, subd. (a).)[1]  It also found true the allegation he committed the burglary for the benefit of a criminal street gang.  (§ 186.22, subd. (b)(1).)  In a bifurcated proceeding, the trial court found appellant had suffered a prior serious felony and a prior strike conviction, and he had also served a prior prison sentence.  (§§ 667, subds. (a)(1) & (b)-(i), 667.5, subd. (b).)

The trial court sentenced appellant to eight years in prison for the burglary (double the midterm), plus ten years for the gang enhancement on the belief the burglary constituted a violent felony.  (§ 186.22, subd. (b)(1)(C).)  The court stayed appellant's

---

[1]     Unless noted otherwise, all further statutory references are to the Penal Code.

6

sentence for street terrorism and imposed a five-year term based on his prior serious felony conviction, bringing his total term of imprisonment to 23 years.

I

Appellant contends the trial court erred in admitting Tully's testimony about the alleged burglary of her neighbor's residence in Torrance. Because appellant was not tried in connection with that burglary, he argues Tully's testimony was irrelevant and unduly prejudicial. We disagree.[2]

Although appellant was not tried in connection with the burglary Tully witnessed, he was charged in Los Angeles Superior Court with committing that offense. However, following the preliminary hearing, the court granted the prosecution's motion to dismiss the case in the interest of justice. (§ 1385.) In light of that dismissal, appellant argued below that Tully's testimony should have been excluded. However, given the similarities between the Torrance burglary and the Truax burglary, the trial court ruled Tully's testimony was more probative than prejudicial and thus admissible. In instructing on the permissible use of that testimony, the court told the jurors they could only consider it with respect to the issues of identification and as to whether appellant acted pursuant to a common plan or scheme. The court prohibited the jury from using Tully's testimony to conclude appellant "had a bad character or is disposed to commit crime."

Generally, evidence of a defendant's uncharged conduct is inadmissible to prove his behavior on a specific occasion or his propensity for criminal activity. (Evid. Code, § 1101, subd. (a).) However, such evidence may be admitted to prove some other material fact, such as identity, plan or motive. (*Id.*, subd. (b).) While evidence of uncharged conduct may be excluded under Evidence Code section 352 if its probative value is substantially outweighed by its prejudicial effect, the trial court has considerable

---

[2] The trial court also admitted evidence of another uncharged residential burglary that was carried out by Tisby and Justin Stevens in April 2010. However, appellant does not challenge the admission of this evidence.

7

discretion in making this determination. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 404-405.) We will not disturb a court's decision in this regard unless it is arbitrary, capricious or patently unreasonable. (*People v. Ochoa* (2001) 26 Cal.4th 398, 437-438; *People v. Kipp* (1998) 18 Cal.4th 349, 371.)

Appellant argues that since the charges against him in the Torrance case were dismissed, Tully's testimony had no logical bearing on the present case. In so arguing, he assumes the Torrance case was dismissed because the prosecution was unable to prove he was involved in it. But there is no evidence in the record to support that assumption. All we know is that, pursuant to section 1385, the case was dismissed in the interests of justice.

In any event, a prior trial and/or conviction is not required before evidence of uncharged conduct may be admitted. So long as there is "evidence" that the defendant committed "a crime, civil wrong or other act" that is relevant to the present case, the trial court may admit it. (Evid. Code, § 1101, subd. (b).) This is true whether the conduct in question occurred before or after the charged offense. (*People v. Griffin* (1967) 66 Cal.2d 459, 464-465; *People v. Taylor* (1986) 180 Cal.App.3d 622, 626.)

In her testimony, Tully implicated appellant in suspicious activity that occurred at her neighbor's house three months after the charged offense. Although the charges against appellant were dropped in that case, Tully's testimony was sufficient to connect to him to that incident. Moreover, as her testimony revealed, the circumstances of that incident were similar to the charged offense in that it involved two black men prowling around a residence in the middle of the day. Each case involved a getaway driver, each case had trappings of the "knock-knock" burglaries appellant's gang was known for, and in each case, Erica Jones, the girlfriend of appellant's brother Rodney, was connected to the getaway car. The similarities between the Torrance incident and the Truax burglary were sufficient to make Tully's testimony relevant to the issues of identification and whether the burglars utilized a common plan in carrying out the crimes.

As far as prejudice is concerned, the record shows Tully's testimony about the Torrance incident was not very lengthy, nor was it any more inflammatory than the evidence respecting the Truax burglary. The trial court limited the jury's consideration of her testimony to relevant issues and prohibited the prosecution from using her testimony to tarnish appellant's character. Considering all of these circumstances, we do not believe the trial court erred in allowing Tully to testify. We discern no abuse of discretion in the court's ruling.

## II

Appellant also contends that, in order to ensure he received a fair trial on the burglary charge, he should have been separately tried on that charge before he was tried on the gang charges. That way, we are told, the jury would have been able to decide his fate on the burglary charge without reference to any prejudicial gang evidence. We see no abuse of discretion in the trial court's decision to try appellant on all of the charges in a single trial.

In the interest of judicial economy, there is a preference that all charges against a defendant be handled in one proceeding. (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1220.) Absent a clear showing joinder resulted in prejudice to the defendant, we will not disturb a trial court's refusal to sever charges which were properly consolidated in a single case. (*Ibid*.) "If the evidence underlying the charges in question would be cross-admissible, that factor alone is normally sufficient to dispel any suggestion of prejudice and to justify a trial court's refusal to sever properly joined charges. [Citation.]" (*People v. Soper* (2009) 45 Cal.4th 759, 774-775.) This rule applies in gang cases such as the one at bar. (*People v. Hernandez* (2004) 33 Cal.4th 1040.) Therefore, if the evidence supporting the gang charges would be admissible at a trial on the nongang charges, "any inference of prejudice would be dispelled and bifurcation would not be necessary." (*Id*. at p. 1050.)

9

Speaking to the issue of cross-admissibility, appellant argues Marshall's testimony regarding the Rollin' 30's expertise in committing knock-knock burglaries was irrelevant to the underlying burglary charge because "there was no evidence that the charged burglary fit the description of a 'knock-knock burglary.'" However, the Truax burglary occurred in a residential neighborhood in the middle of the day. It was carried out by two black men, one of whom utilized a pillowcase to stash his loot. And the burglars utilized a getaway car that was rented by a third party. As Marshall explained, these are all tell-tale characteristics of a knock-knock burglary.

Appellant is correct that there was no direct evidence the burglars knocked on Truax's door before entering his residence. However, there was circumstantial evidence to that effect. Truax testified he was awakened by noises he assumed were coming from his roommates. But since his roommates were not home at the time of the burglary, the jury could infer the sounds that woke him up were caused by the burglars knocking on his front door. It is entirely plausible that when Truax didn't answer the door, the burglars entered his house under the mistaken belief no one was home. Suffice it to say, the Truax burglary had enough similarities to a knock-knock burglary to make Marshall's testimony pertinent to the issues of identity and modus operandi.

Marshall's testimony was also relevant to explain appellant's motive for the burglary. Marshall stated that, beyond the obvious personal financial incentive inherent in most burglaries, part of the money gang members acquire from such crimes goes toward buying drugs and guns for their gang and recruiting other gang members. He said this was true of the Rollin' 30's in particular. Since bringing in money is part of what gang members are expected to do, appellant's gang membership was relevant in terms of showing his motive to commit the charged offense. And since the gang evidence was cross-admissible, any inference of prejudice from combining the gang charges with the burglary charge in a single trial was effectively dispelled. A joint trial on all the charges did not constitute an abuse of discretion or infringe appellant's right to a fair trial.

10

Next, appellant claims there is insufficient evidence the burglary was gang related, so as to support the jury's findings on the gang charges. The claim is unavailing.

The standard of review for assessing the sufficiency of the evidence to support a criminal conviction is "highly deferential." (*People v. Lochtefeld* (2000) 77 Cal.App.4th 533, 538.) Our task is to """"examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence[.]"""" (*People v. Alexander* (2010) 49 Cal.4th 846, 917.) "Although we must ensure the evidence is reasonable, credible, and of solid value," we must keep in mind "it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.]" (*People v. Jones* (1990) 51 Cal.3d 294, 314; see also *People v. Elliott* (2012) 53 Cal.4th 535, 585.)

As a technical point of clarification, the gang "enhancement under section 186.22 (b)(1) punishes gang-related conduct, i.e., felonies committed with the specific intent to benefit, further, or promote the gang. [Citation.]" (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1138.) In comparison, the gravamen of street terrorism is active participation in a criminal street gang. (*People v. Albillar* (2010) 51 Cal.4th 47, 55.) Contrary to appellant's assumption, the elements of that crime "can be satisfied without proof the felonious conduct [at issue] promoted, furthered, or assisted was gang related." (*Id.* at p. 56.) Therefore, appellant's complaint about the lack of evidence showing the burglary was gang related only pertains to the gang enhancement.

That said, there is substantial evidence the Truax burglary was gang related. Appellant and Tisby were members of a gang that specialized in the commission of residential burglaries. They were clearly working in association with each other when they broke into Truax's home looking for things to steal. And they made their getaway in a car that was rented by a third party, which their gang was known to do. By virtue of

their gang association, they knew they could rely on each other to work together proficiently and not implicate one another if they got caught. In that sense, their gang ties allowed them to commit the burglary with increased efficiency and confidence, even though the crime did not play out as they expected. (See *People v. Albillar, supra,* 51 Cal.4th 47 at p. 61 [jury could find crime was gang related where defendants worked in a coordinated manner and relied on each other's loyalties in carrying it out].)

Moreover, Marshall testified that when gang members commit a crime that results in monetary gain, the proceeds from the offense are often used to buy guns, drugs, and party supplies for the gang. The money is used toward expenses involved in committing future gang crimes and recruiting new gang members. So, it's not just the individual gang members who benefit from the crimes they commit, but the gang as a whole. Considering the circumstances surrounding the Truax burglary and Marshall's expert testimony on the workings of appellant's gang, the jury could reasonably find the burglary was gang related. There is substantial evidence to support the jury's finding in that regard.

IV

Appellant also contends there is insufficient evidence to support his convictions because Truax had difficulty identifying him at trial, and the circumstantial evidence implicating him in the burglary was weak. He argues his convictions were essentially based on nothing more than innuendo and guilt by association, but we find substantial evidence to support the jury's verdict.

As we have noted, the standard of review for assessing the sufficiency of evidence to support a criminal conviction is highly deferential. That is true even when, as here, the main issue at trial was identification. Indeed, "'[t]he strength or weakness of the identification [evidence], the incompatibility of and discrepancies in the testimony, if there were any, the uncertainty of recollection, and the qualification of identity and lack of positiveness in testimony are matters which go to the weight of the evidence and the

credibility of the witnesses, and are for the observation and consideration, and directed solely to the attention of the jury in the first instance . . . .' [Citation.]" (*People v. Mohamed* (2011) 201 Cal.App.4th 515, 522.) On appeal, we cannot overturn a conviction simply because there are conflicts in the identification evidence or some of the testimony is subject to justifiable suspicion. (*People v. Elliott, supra,* 53 Cal.4th at p. 585.) Instead, we can only "'set aside a jury's finding of guilt [if] the evidence of identity [is] so weak as to constitute practically no evidence at all.' [Citations.]" (*People v. Mohamed, supra*, 201 Cal.App.4th at p. 521.)

That is clearly not the situation in this case. Truax testified he got a pretty good look at the second burglar's face when he ran past him in the driveway, noticing also that he was a young black man with a medium build and cornrows. Although the encounter was brief, Truax was able to identify appellant as that burglar when he was shown a photographic lineup a month later. And that was not simply because appellant's photo depicted him wearing cornrows. Rather, Truax based his identification on a variety of factors, including not only his hair, but his age, face and body type, as well.

Truax did have some difficulty identifying appellant by the time the case got to trial three years later. At the preliminary hearing, he was unable to identify appellant, and at trial, he initially identified appellant as the first burglar he encountered and Tisby as the second. However, the law does not require a prior out-of-court identification to be corroborated by an in-court identification. (*People v. Cuevas* (1995) 12 Cal.4th 252.) In any event, there was evidence appellant and Tisby had changed their appearances from the time of the burglary until the time of trial. Not only had their weights changed, but at trial appellant was wearing his hair straight, and Tisby was sporting cornrows, which is the opposite of how they wore their hair at the time of the burglary. Under those circumstances, it is not surprising Truax had difficulty identifying them at first. However, as his testimony wore on, he ultimately identified appellant as the

13

second burglar, which was consistent with his pretrial identification. The identification evidence was not overwhelming, but it was solid enough to withstand appellate scrutiny.

In addition, there was considerable circumstantial evidence connecting appellant to the burglary. A week after the crime, the police stopped appellant while he was driving a car that had been rented by Erica Jones, who was the girlfriend of appellant's brother Rodney. As it happened, Jones was the one who had rented the car that was used in the Truax robbery. It also turned out that Tisby was present with appellant during the stop. This is significant because Truax identified Tisby as the person he encountered inside his house during the burglary. Appellant was also implicated in a similar burglary that occurred three months later, and to top it off, both he and Tisby were members of a gang that specialized in the type of daytime burglaries at issue in this case. Standing alone, this evidence did not conclusively establish appellant committed the Truax burglary. However, considering it along with the identification evidence, the jury could reasonably conclude appellant was guilty of that offense. Because there is substantial evidence to support the jury's finding in that regard, we are powerless to disturb it.[3]

V

Lastly, appellant asserts the trial court erred in sentencing him to 10 years on the gang enhancement. He contends the sentence should be reduced to five years because the prosecution did not plead the requirements for the greater punishment. We agree.

Sentencing on the gang enhancement is dependent on the nature of the underlying offense. If the crime is a simple felony, the punishment is two, three or four

---

[3] Appellant contends that, even if he was the man who ran past Truax in his driveway, there is insufficient evidence he was guilty of burglary because he did not enter Truax's residence or aid and abet Tisby in doing so. Appellant raised this issue in supplemental briefing that we requested on an unrelated sentencing issue, so it is not properly before us. In any event, Truax testified he saw appellant run *from his house* just before he passed him in the driveway, and it is clear from the circumstances of the burglary appellant and Tisby were working in cahoots. Therefore, appellant's claim fails on its merits, as well.

years in prison. (§ 186.22, subd. (b)(1)(A).) If the crime is a serious felony, the punishment is five years. (*Id.*, at subd. (b)(1)(B).) And if the crime "is a violent felony, as defined in subdivision (c) of Section 667.5, the person shall be punished by an additional term of 10 years." (*Id.*, at subd. (b)(1)(C).)

The list of violent felonies in section 667.5, subdivision (c) includes "[a]ny burglary of the first degree, as defined in subdivision (a) of Section 460, wherein it is *charged and proved* that another person, other than an accomplice, was present in the residence during the commission of the burglary." (§ 667.5, subd. (c)(21), italics added.) Appellant argues that, although he was convicted of first degree burglary, which is a serious felony, the crime was not a violent felony for sentencing purposes because the information did not allege another person other than an accomplice was present during its commission.

The information alleged, "On or about August 11, 2009, in violation of Sections 459-460(a) of the Penal Code (FIRST DEGREE RESIDENTIAL BURGLARY), a FELONY, FRANK GEORGE TISBY and ROGER NEAL SHACKLEFORD did unlawfully enter an inhabited dwelling house, trailer coach, and inhabited portion of a building, inhabited by Truax, with the intent to commit larceny."

The Attorney General claims that, reasonably understood, this language — particularly the phrase "inhabited by Truax"— provided notice the prosecution was alleging Truax was present during the burglary, so as to elevate the burglary from a serious to a violent felony for purposes of the gang enhancement. However, regarding the crime of burglary, "'inhabited' means currently being used for dwelling purposes, *whether occupied or not*." (§ 459, italics added.) Thus, alleging Truax "inhabited" the building appellant burglarized did not necessarily assert Truax was "present" in the building during the burglary, which is what section 667.5, subdivision (c)(21) requires to be charged.

15

That may sound hyper-technical, but the California Supreme Court has been very strict in terms of interpreting the "pled and proved" requirement of criminal statutes. For example, in *People v. Mancebo* (2002) 27 Cal.4th 735 (*Mancebo*), the court determined it was improper to use the multiple victim circumstance in the One Strike law where that circumstance was not specifically alleged in the prosecution's charging documents. The substantive counts of the information clearly indicated the defendant was being charged with victimizing multiple children, the evidence at trial showed as much, and there was really no way to defend against the multiple victim circumstance had it been pled. However, the *Mancebo* court held the One Strike law explicitly requires all relevant circumstances to be "pled and proved" and "alleged in the accusatory pleading" before they can be used to increase the defendant's sentence. (*Id*. at pp. 741-742, fn. 4, quoting § 667.61, subds. (f) & (i).) Despite the presence of a factual basis for the multiple victim circumstance, *Mancebo* forbade its use against the defendant in that case because "no factual allegation in the information or pleading in the statutory language informed [him] that if he was convicted of the underlying charged offenses, the court would consider his multiple convictions as a basis for One Strike sentencing . . . ." (*Mancebo, supra*, 27 Cal.4th at p. 745.)

Likewise here, appellant was never apprised in the charging documents that if convicted of the burglary charge, the court would consider Truax's presence during the burglary as justification for increasing his sentence on the gang enhancement from five years to ten years. While the evidence plainly showed Truax was present during the burglary, the prosecution never notified appellant of the legal significance of this fact. That undermined appellant's right to notice of the severity of the charges he was facing.

In fairness to the prosecutor, it does not appear he was trying to sandbag the defense by failing to bring up the issue. Rather, it appears he simply believed the wording of the information was good enough to satisfy due process. However, the information actually provided appellant with less notice than the information that was

16

found lacking in *Mancebo*. Whereas the information in *Mancebo* at least provided a factual basis for the sentence enhancement at issue in that case, here, as explained above, the information did not even supply that minimal information. More importantly, the information failed to apprise appellant the prosecution intended to use the nonpleaded fact of Truax's presence in the residence to double the enhancement on the gang allegation from five to ten years.

The Attorney General correctly notes that in reaching its decision in *Mancebo*, the California Supreme Court limited its holding to the One Strike law. (*Mancebo, supra*, 27 Cal.4th at p. 745, fn. 5.) However, the court's analysis was informed by cases that involved analogous statutes that contain "pled and proved" requirements, including the statute at issue here, section 667.5. (*Mancebo, supra*, 27 Cal.4th at pp. 745-746, discussing *People v. Haskin* (1992) 4 Cal.App.4th 1434.)

Moreover, *Mancebo* makes clear that "in addition to the statutory requirements that enhancement provisions be pleaded and proven, a defendant has a cognizable due process right to fair notice of the specific enhancement allegations that will be invoked to increase punishment for his crimes." (*Mancebo, supra*, 27 Cal.4th at p. 747.) If, as here, such notice is not afforded, the resulting sentence is legally unauthorized and harmless error analysis does not apply. (*People v. Hernandez* (1988) 46 Cal.3d 194, 208-209, discussed with approval in *Mancebo, supra,* 27 Cal.4th at pp. 746-747, 749.) Therefore, we reverse appellant's 10-year sentence on the gang enhancement and order the imposition of a 5-year sentence in its stead.

In addition, because appellant was not charged and convicted of a violent offense, he is not subject to the 15 percent conduct credit limitation set forth in section 2933.1, which the trial court applied in calculating appellant's presentence credits. The Attorney General does not dispute this. However, she claims appellant is subject to the 20 percent conduct credit limitation set forth in section 1170.12 because he is a second strike offender. That section does place a 20 percent cap on the amount of conduct

17

credits a defendant can receive if he has previously been convicted of one or more strike offenses. (§ 1170.12, subd. (a)(5).) But that limitation applies to *postsentence* conduct credit, not *presentence* conduct credit. (*People v. Buckhalter* (2001) 26 Cal.4th 20, 32.) As such, appellant is entitled to receive presentence conduct credit at the standard rate of "two days . . . for each four-day block of time served." (*People v. Kimbell* (2008) 168 Cal.App.4th 904, 908.) Under that formula, appellant is entitled to 146 days of presentence conduct credit, based on his 294 days of actual custody, for a total credit award of 440 days. We will modify the judgment to reflect this change.

DISPOSITION

The judgment is reversed with respect to appellant's 10-year sentence on the gang enhancement, which is modified to a term of 5 years in prison. In addition, appellant's presentence conduct credits are modified from 44 to 146 days, resulting in a total credit award of 440 days. The clerk of the trial court is directed to prepare an amended abstract of judgment reflecting these modifications and forward a certified copy to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.


BEDSWORTH, ACTING P. J.

WE CONCUR:


FYBEL, J.


IKOLA, J.